MASSACHUSETTS BONDING & INSURANCE CO. v. TRANS-AMERICAN FREIGHT LINES, INC.

1. PRINCIPAL AND AGENT—APPARENT AUTHORITY—QUESTION FOR JURY.

The apparent authority of an agent to act as the representative of his principal is to be gathered from all the facts and circumstances in evidence, and ordinarily this is a question of fact for the jury's determination.

2. SAME—APPARENT AUTHORITY—EVIDENCE.

Persons dealing with an agent may rely on his apparent authority which is to be gathered from all the facts and circumstances properly admitted in evidence.

3. SAME—APPARENT AUTHORITY—ESTOPPEL.

Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it.

4. INSURANCE—AUTHORITY OF AGENT—QUESTION FOR JURY.

In insurer's action against insureds for premiums on public liability, property damage and workmen's compensation policies, whether or not president of defendant corporations was justified in assuming that insurance agency was authorized to carry on negotiations and make assurances upon which he claims to have relied *held*, question of fact for jury under defendants' claim that policies sued upon did not contain the entire contract of the parties.

5. CORPORATIONS—APPARENT AUTHORITY OF OFFICERS AND AGENTS—RESTRICTIONS—NOTICE.

An officer or agent of a private corporation, intrusted with the general management and control of its business and affairs, has implied or apparent authority to do acts or make any contracts in its behalf falling within the scope of the ordinary and usual business of the company, and limitations and restrictions placed upon his express or implied authority, of which persons dealing with him have neither actual nor constructive notice, will not serve to restrict such powers to the prejudice of innocent third persons.

6. SAME—BRANCH MANAGER—EXTENT OF AUTHORITY.

Authority of one who is intrusted with the management of a particular branch of a corporation's business only does not extend beyond such contracts and acts as are incident to the management of that particular branch.

7. SAME—PRESUMPTION AS TO EXTENT OF BRANCH MANAGER'S AUTHORITY—SECRET INSTRUCTIONS—NOTICE.

A presumption exists that the officer or agent of a private corporation in general charge of a branch office of a business corporation has the necessary authority to transact the ordinary and usual business of such office, and to bind the company by a contract necessary and proper to be made in the prosecution of its business, and third persons dealing with

him in good faith are not bound by any secret instructions or restrictions given or imposed upon such manager by the head office of which such third persons had no notice.

8. INSURANCE—AUTHORITY—VICE-PRESIDENT—QUESTION FOR JURY.

In insurer's action for premiums on public liability, property damage and workmen's compensation policies in which insureds claimed policies were incomplete and did not contain the entire contract, whether plaintiff's vice-president was authorized to enter into oral contract insureds alleged existed and to clothe an insurance agency with apparent authority to act for plaintiff *held*, a question of fact for the jury.

9. SAME—EVIDENCE OF ADDITIONAL ORAL AGREEMENTS.

Under theory that policies of insurance issued defendants constituted an acceptance of an oral offer or a written offer which insureds accepted, since it was unnecessary to have defendants' offer, on the one hand, or acceptance, on the other, in writing as they would be bound by conduct as much as by their writings, evidence of contemporaneous oral agreements would not violate the so-called parol evidence rule where conduct is reasonably susceptible to contradictory conclusions.

10. EVIDENCE—VARYING WRITTEN INSTRUMENTS.

The true contract between the parties to a controversy may be shown if the writing introduced does not embody the entire contract as the rule excluding evidence to vary a written instrument would not be applicable.

11. SAME—WRITTEN CONTRACTS—PAROL EVIDENCE.

If a plaintiff alleges that a written contract between the parties to an action varies from their true agreement and defendant admits that the contract does not express the agreement truly but sets up an agreement different from that alleged by plaintiff, the real contract may be established by parol evidence.

12. CONTRACTS—PRIOR NEGOTIATIONS—EVIDENCE.

Rule that when parties have merged all prior negotiations and agreements in a writing, intending to make that the repository of their final understanding, evidence of such prior negotiations and agreements will not be received, though commonly referred to as the "parol evidence rule," is an inflexible rule of substantive law which, when applicable, defines the limits of a contract.

13. EVIDENCE—COLLATERAL, COMPLEMENTARY AND CONTEMPORANEOUS AGREEMENTS.

  A collateral agreement that the writing is not to take effect until the happening of some other event, portions of an entire agreement not contained in the writing when it appears that only a portion of the agreement was intended to be reduced to writing, and an entirely distinct contemporaneous agreement, may all be proved by parol.

14. CONTRACTS—PARTICULAR SUBJECTS OF NEGOTIATION—EVIDENCE.

  In ascertainment of intent of parties to a controversy to restrict writing to specific subjects of negotiation it should be ascertained whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing and if there contained, presumably the writing was meant to represent all of the transaction on that element; if not there, then probably the writing was not intended to embody that element of the negotiation.

15. INSURANCE—PREMIUMS—ADDITIONAL CONTRACT AS TO PREMIUMS —QUESTION FOR JURY.

  In insurer's action against insureds for premiums on public liability, property damage and workmen's compensation policies, based on policies signed by insurer only, in which action defendants claimed a lesser premium by reason of contemporaneous oral agreement apart from the policies, whether there was such oral agreement *held*, a question for the jury.

16. SAME—POLICIES AS COMPLETE CONTRACTS—QUESTION FOR JURY.

  In insurer's action against insureds for premiums on public liability, property damage and workmen's compensation policies whether entire agreement was reduced to writing in the policy or whether the policy was incomplete as the contract between the parties *held*, a question of fact for the jury.

17. EVIDENCE—INCOMPLETE INSURANCE CONTRACT—PAROL EVIDENCE.

  In insurer's action against insureds for premiums on public liability, property damage and workmen's compensation policies, parol evidence was admissible to prove contract as alleged by defendants who claimed policy was incomplete whether policy was delivered on oral application of defendants or delivered to them with no written acceptance by them.

18. TRIAL—COMPROMISE VERDICTS.

  Compromise verdicts are improper provided they are clearly compromise and could not have been reached by any proper

method of computation, but a verdict will not be set aside as a result of compromise unless it clearly appears that it actually was such a result.

19. Same—Reconciliation of Verdict to Claims of Parties.
   Fact that the computations of the jury are not reconcilable to the claims of the parties does not vitiate its finding.

20. Same—Compromise Verdict—Complicated Computations—Evidence.
   Claim that verdict, as rendered by jury in action by insurer for premiums on public liability, property damage and workmen's compensation policies, was a compromise verdict *held,* not sustained where there is no showing jury did not arrive at its verdict by the honest judgment of its members, that any method of chance or compromise was used, even though computations were complicated, and there was evidence to support the verdict.

Appeal from Wayne; Merriam (DeWitt H.), J. Submitted April 19, 1938. (Docket No. 133, Calendar No. 40,009.) Decided October 5, 1938. Rehearing denied November 10, 1938.

Assumpsit by Massachusetts Bonding & Insurance Company, a Massachusetts corporation, against Transamerican Freight Lines, Inc., and Triangle Motor Freight Forwarding Company, Michigan corporations, for premiums on insurance policies. Verdict for plaintiff. From judgment for plaintiff in an increased amount, defendants appeal. Plaintiff moves for a new trial in case of reversal. Reversed and judgment ordered entered on verdict.

*Howard Farrell,* for plaintiff.

*Thomas F. Chawke* and *Richard J. Sullivan,* for defendants.

McAllister, J.   Plaintiff filed suit to collect from defendants premiums on insurance policies based

upon the provisions contained in such policies. Defendants claimed that the policies were incomplete and did not contain the entire terms of the contract. On the trial, defendants admitted owing plaintiff the sum of $11,175.78. Plaintiff claimed that there was due under the contract the sum of $22,152.70. There was a verdict of the jury for plaintiff in the amount of $14,534.13. Plaintiff filed motion for judgment notwithstanding verdict for the entire amount of its claim which the trial court granted. Defendants appeal.

On February 21, 1935, following difficulties with regard to insurance costs and premiums, Robert Gotfredson, president of the defendant companies, went to New York City where he had a conference with Wallace Falvey, vice-president of plaintiff company and manager of its New York office. The conference had been arranged and was also attended by Henry Farmer of Farmer & Ochs, Inc., insurance agents, with whom Gotfredson had transacted business in the past and who was instrumental in selling policies of insurance in which plaintiff was insurer. It is the claim of Gotfredson that the purpose of the conference was to ascertain whether the Massachusetts Bonding & Insurance Company would again go upon risks on which they had previously insured defendants.

In December, 1934, plaintiff company had been insurer on the said risks and at that time had advised defendants that they would not renew the same unless the defendants agreed to pay an annual premium therefor in the amount of $48,000; defendants then sought and obtained coverage with the Columbia Casualty Company, which company advised them that they would bind the policies and the premium would be determined by the "bureau" with which the Columbia Casualty Company was associated. It

is claimed that the Columbia Casualty Company asserted that in no event would the annual premium be less than $40,000 nor more than $48,000. Defendants state that subsequently the Columbia Casualty Company notified them that their "bureau" had promulgated a rate which would have developed an annual premium far in excess of the maximum premium theretofore quoted; that the defendants, therefore, advised the Columbia Casualty Company that they could not and would not pay the premium called for by the "bureau" rate, and thereafter the defendants received a cancellation notice from the said company.

Gotfredson claims that at the time of the conference in New York with the vice-president of plaintiff company, an oral agreement was entered into whereby plaintiff company agreed that it would issue public liability, property damage and workmen's compensation policies of insurance to the defendants upon a "cost plus" basis, provided defendants would pay to plaintiff the sum of $5,000 by way of contribution to the plaintiff to indemnify it against excess losses which it had sustained by reason of having provided the defendants with similar policies of insurance in previous years, and it is claimed by defendants that upon the agreement to pay such sum of $5,000, plaintiff agreed to remain upon the policies insuring defendants for a period of 12 months from the date of their issuance.

With regard to the "cost plus" feature of the alleged oral contract, Gotfredson claims that in determining the premiums which defendants would be required to pay, a figure of $54,000 was agreed upon as the estimated annual premium, of which premium 40 per cent. thereof, or $21,600, was understood to be the amount which would accrue to plaintiff for writing the policies, and 60 per cent. of the premium

or $32,400 represented the anticipated losses which the company would sustain as a result of having insured the risks.

It is further claimed by defendants that it was agreed under such "cost plus" plan that adjustments would be made between the parties at the end of the policy periods, whereby the defendants would be entitled to receive from the plaintiff, should the actual losses be not as great as contemplated, a sum equal to the difference between the actual losses sustained and the said sum of $32,400; and that in the event that the annual losses should exceed said sum, they would be "loaded" 25 per cent., and the excess amount distributed over a 12-month policy period.

It is claimed by Gotfredson that the agreement included the compensation insurance which was to be written upon a like "cost plus" plan, subject to adjustment upon a 60-40 basis as provided for in the "cost plus" plan for the public liability and property damage policies of insurance.

Gotfredson returned to Detroit and, on February 23, 1935, two days after the conference, wrote a letter to Farmer in which he outlined the alleged understanding and oral agreement of February 21, 1935. This letter was received in due course by Farmer but he did not present it to plaintiff company until a month or six weeks later. On February 23, 1935, the same date on which Gotfredson had written the letter to Farmer, Farmer wrote to Gotfredson advising that binders on liability and property damage insurance had been issued with the Massachusetts Bonding & Insurance Company effective March 1st, at which time the Columbia policy expired. The compensation insurance was also bound effective March 8, 1935. Farmer further advised Gotfredson that he hoped to be able to mail

the policies to the various State commissions in the states in which defendants operated and that they would be in the hands of the commissions before the expiration of the Columbia policies.

Farmer further advised Gotfredson that he had a talk with Mr. Billings, the underwriter, who calculated rates, arranged with the "bureau" for promulgation, and prepared the "experience," and had "outlined (to Billings) the understanding we had with Mr. Falvey and briefly gave him your ideas as expressed by the pencil memorandum. The principles in general seem to be quite satisfactory and we will get together next week and draw up a memorandum so that there will be no misunderstanding in the future. In accordance with the agreement, I would appreciate it if you would send your check for $5,000 to apply on losses occurring prior to December 31, 1934."

On March 12, 1935, Farmer wrote Gotfredson with regard to the matter of an inspection service but did not say anything about the conference discussions or the memorandum mentioned in his previous letter. On March 25, 1935, Farmer wrote Gotfredson stating:

"As you suspected, the Columbia Casualty Company have been raising every obstacle with the bureau that it was possible for them to raise. Mr. Billings had a conference with the bureau this morning and feels that he has the matter pretty well straightened out, but the bureau have requested that we obtain from you a letter outlining the history of the whole transaction, and if it is as Mr. Billings has repeated to them I think we will have no further difficulty. I am inclosing herewith a draft of a letter which I would suggest that you write to us provided it recites the facts correctly. If there are any other facts which you consider important, which are

not included in this draft, I would suggest that you add them."

The draft of the letter which was proposed by Farmer, to have Gotfredson sign and return to him, recited the transaction of the Columbia Casualty Company and quotations for premiums received from other companies and concluded:

"I was in New York on February 21st and with you interviewed Mr. Wallace Falvey, vice-president of the Massachusetts Bonding & Insurance Company, at which time you will remember he agreed to go back on the risk at a premium of $54,000."

Gotfredson refused to sign this proposed letter, but instead repeated the paragraph above set forth, changing it however to read:

"He agreed to go back on the risk at a premium of $54,000.00, *subject to the terms outlined in my letter to you of February 23d.*"

Not receiving a response, Gotfredson again wrote Farmer April 1st:

"My principal concern right now of course is where we are heading with the Massachusetts Bonding & Insurance Company in the way of a premium, and also as to the charging to our experience of $5,000 or $10,000 loss. This matter has not as yet been confirmed. We also have no confirmation as to waiving of premium on added trucks whether hired or owned unless such added premium will be necessary to produce the 60 per cent. loss ratio."

On April 4, 1935, Gotfredson wrote again to Farmer with regard to certain claims and concluded:

"Have you had a confirmation from the Massachusetts Bonding & Insurance Company concerning the terms of our coverage with them? If so, would

appreciate your forwarding same to me at your earliest convenience.''

On April 15, 1935, he again wrote Farmer stating the following:

''I would like to again refer you to our letter of February 23d in which I confirmed the arrangement that the Massachusetts were to cover our PD and PL. Although we have written every week for a confirmation of this letter we have not received it to date. When the confirmation of the terms of our letter have been accepted, we will forward the balance of the $5,000 contribution to you.''

It does not appear that Gotfredson ever received any confirmation of the terms as outlined in his letter of February 23, 1935.

The policies in question were not received by defendants until March 29, 1935. Mr. Falvey testified on the trial with regard to the conference:

''I did authorize the reduction of my thoughts, and Mr. Gotfredson's thoughts and Mr. Farmer's thoughts into the written contracts of insurance to cover these two corporations, on the basis of $54,000 for the automobile insurance.''

Mr. Farmer, sworn as witness on behalf of plaintiff, testified:

''There was an agreement, apart from the policies, but not in writing, that he was to pay sufficient on renewal.''

It is the claim of defendants that Farmer & Ochs, Inc., was the agent of plaintiff company in writing the insurance and in the entire insurance transaction, and it is contended that whether plaintiff authorized the said agency to act as its agent or not, the facts and circumstances surrounding their con-

duct and that of plaintiff company presents a question of fact as to whether they had apparent authority to act for plaintiff in this case.

"The apparent authority of an agent to act as the representative of his principal is to be gathered from all the facts and circumstances in evidence, and ordinarily this is a question of fact for the jury's determination." 21 R. C. L. p. 856.

In *Faber* v. *Eastman, Dillon & Co.*, 271 Mich. 142, the court said:

"It is elementary that persons dealing with an agent may rely on his apparent authority (*Marx* v. *King*, 162 Mich. 258), and that such authority is to be gathered from all of the facts and circumstances properly admitted in evidence. *Haines* v. *Leonard Warehouses, Inc.*, 199 Mich. 580. *Kerns* v. *Lewis*, 249 Mich. 27. This question was discussed at length by Mr. Justice McDonald, speaking for the court, in *Maryland Casualty Co.* v. *Moon*, 231 Mich. 56, and the following from 21 R. C. L. p. 856 was quoted with approval (p. 62) :

" 'Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it.' "

In *Garey* v. *Kelvinator Corp.*, 279 Mich. 174, it was held that the implied power and apparent authority of an agent is usually to be gathered from facts and circumstances and is generally a question for the jury.

It appears that in statement of premium made by the auditing division of the Massachusetts Bonding & Insurance Company there was printed the name of Farmer & Ochs under the title "general agent."

In plaintiff's report on losses, the name of the insurance agency appeared as "agent," although there was no name filled in under the title "sub-agent" or "broker." On other documents prepared by plaintiff for its own use and that of insured parties, the name of Farmer & Ochs appeared as agents. Mr. Falvey, vice-president of plaintiff company, on cross-examination stated that such a designation was due to a mistake.

During the years previous to the transaction in question, while defendants were insured with plaintiff company, the policies always came direct from Farmer & Ochs to defendant companies and the same agency collected the premiums and billed the defendants for them.

When the conference took place in New York, Farmer was in consultation with the vice-president of plaintiff company before Gotfredson arrived, and during the conference, Farmer expressed his views with reference to the terms under discussion. He also discussed the matter of the "understanding we had with Mr. Falvey" with Mr. Billings and gave him the ideas expressed by Gotfredson and wrote defendants: "The principles in general seem to be quite satisfactory and we will get together next week and draw up a memorandum so there will be no misunderstanding in the future." Farmer also transmitted Gotfredson's letter outlining the insurance agreement to the company, and communicated with defendants regarding the objections raised to the proposals by another insurance company. From all the facts and circumstances, it was a question of fact for the jury as to whether Gotfredson was justified in assuming that Farmer & Ochs was authorized to carry on these negotiations, and make the assurances upon which Gotfredson claims he relied.

As to whether Falvey, as vice-president of plaintiff company and manager of the New York office, had authority to enter into the agreement alleged, and to clothe the insurance agency with apparent authority to act for plaintiff, the law is stated as follows in 2 Fletcher Cyclopedia Corporations (Perm. Ed.), p. 606:

"An officer or agent of a private corporation, intrusted with the general management and control of its business and affairs, has implied or apparent authority to do acts or make any contracts in its behalf falling within the scope of the ordinary and usual business of the company, and limitations and restrictions placed upon his express or implied authority, of which persons dealing with him have neither actual nor constructive notice, will not serve to restrict such powers to the prejudice of innocent third persons."

"If one is intrusted with the management of a particular branch of the business only, his authority does not extend beyond such contracts and acts as are incident to the management of that particular branch. But it must, of course, be assumed that an officer or agent of a private corporation in general charge of a branch office of a business corporation has the necessary authority to transact the ordinary and usual business of such office, and to bind the company by a contract necessary and proper to be made in the prosecution of its business, and persons dealing with him in good faith are not bound by any secret instructions or restrictions given or imposed upon such manager by the head office of which they had no notice." 2 Fletcher Cyclopedia Corporations (Perm. Ed.), p. 616.

Whether Falvey was authorized to enter into the alleged contract was under the evidence a question of fact for the jury.

Plaintiff contends that the policy of insurance is a written contract and that parol evidence is not permissible to vary its terms. Defendants, on the other hand, claim that the policy did not constitute the contract between the parties and that testimony is properly admissible to prove the terms thereof.

The policy was not executed by the parties in the sense that it was a contract signed by both. If the policy be viewed as a contract, it must result as an acceptance of an offer in the nature of an application by defendants; or an offer by plaintiff to which defendants have been bound by an acceptance. On the theory that the policy is an acceptance of an offer made by defendants, such offer was not in writing; and on the theory that the policy is an offer by plaintiff, there is no written acceptance by defendants. Of course, it is not necessary to have such written offer, on the one hand, or a written acceptance on the other. The defendants may be bound by their conduct as much as by their writings. But when such conduct is reasonably susceptible to contradictory conclusions, it cannot be said that contemporaneous oral agreements violate the so-called parol evidence rule, in any event and under all circumstances.

In 22 C. J. p. 1283, it is said:

"Where the writing is such that it does not embody the contract between the parties to the controversy in which it is introduced in evidence, such contract resting in parol, the rule excluding evidence to vary a written instrument does not of course apply, and the true contract may be shown. So also where a bill for relief alleges that a written contract between the parties to an action varies from their true agreement, and defendant admits that the contract does not express the agreement truly but sets

up an agreement different from that alleged by plaintiff, the real contract may be established by parol evidence.''

In *Cohn* v. *Dunn,* 111 Conn. 342 (149 Atl. 851, 70 A. L. R. 740), the court, in discussing the parol evidence rule, said:

''The principle is too well established to require citations that when parties have merged all prior negotiations and agreements in a writing, intending to make that the repository of their final understanding, evidence of such prior negotiations and agreements will not be received. It has been said that there is no rule of evidence more flexible or subject to a greater number of exceptions. But, as has been pointed out by distinguished authority, it is not a rule of evidence, though commonly referred to as 'the parol evidence rule.' 5 Wigmore on Evidence (2d Ed.), § 2400. It is a rule of substantive law which when applicable defines the limits of a contract. 2 Williston on Contracts (1920 Ed.), § 631. Nor is it, as a rule of substantive law, one which is flexible or subject to exceptions. In the great mass of decisions in which the rule has been discussed, the question always has been whether the rule was applicable to the situation presented. When found applicable it has uniformly been enforced. The apparent exceptions to the rule are cases which do not fall within it. A collateral agreement that the writing is not to take effect until the happening of some other event, *portions of an entire agreement not contained in the writing when it appears* that only a portion of the agreement was intended to be reduced to writing, *and an entirely distinct contemporaneous agreement,* may all be proved by parol. *Burns & Smith Lumber Co.* v. *Doyle,* 71 Conn. 742, 745 (43 Atl. 483, 71 Am. St. Rep. 235); *Fernandez* v. *Thompson,* 104 Conn. 366, 369 (132 Atl. 895); *Siller* v. *Philip,* 107 Conn. 612, 620 (141 Atl. 872).

The admission of the parol evidence in none of these cases contravenes the rule, though it may effect quite a different result than if the evidence were confined to proof of the written instrument. The fundamental question is one of the intent of the parties. Did they intend to make *the writing the repository of their final understanding upon the particular matter of agreement as to which evidence is offered dehors the writing?* If so, such evidence must be excluded. If, however, it appears that the parties intended to restrict the writing to specific subjects of negotiation, then other subjects may be proven 'even though they be (as they always are) different from the writing.' 5 Wigmore on Evidence (2d Ed.), § 2431. This intent is to be sought in the conduct and language of the parties and the surrounding circumstances. *Brosty* v. *Thompson,* 79 Conn. 133, 136 (64 Atl. 1); *Pyskoty* v. *Sobusiak,* 109 Conn. 593, 597 (145 Atl. 58). Taking those all into consideration the question becomes one of the inherent probability that parties contracting under such circumstances would or would not make the agreement in writing and also the alleged oral agreement. 2 Williston on Contracts (1920 Ed.), § 638.

" 'In deciding upon this intent, the chief and most satisfactory index for the judge is found in the circumstance whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation. This test is the one used by the most careful judges, and is in contrast with the loose and incorrect inquiry whether the alleged extrinsic negotiation contradicts the terms of the writing.' 5 Wigmore on Evidence (2d Ed.), § 2430.''

"In the application of the rule just stated, and upon the ground that the matters in question were agreements omitted from the writing, which was in that respect, incomplete, evidence has been held admissible to show the amount to be paid under a contract of sale; the time, place, or mode of payment

of amounts due or to become due under a contract; the time, place, or manner of performance; the time and place of delivery of goods sold; the place where services contracted for were to be performed; the length of time during which a contract was to remain in force, for which a lease was to run, or for which insurance was taken." 22 C. J. p. 1288.

In *First National Bank of Hawarden* v. *Branagan*, 198 Iowa, 453 (198 N. W. 659, 36 A. L. R. 548), the court, in passing upon the admissibility of correspondence written prior to the execution of the written contract, said:

"The evidence of the antecedent correspondence was properly received, for that purpose alone. It was the duty of the court to construe the terms of the contract in the light thereof, though it was not permissible to the court to contradict or vary such terms of the contract. The respective interpretations of the contract contended for by the parties do not *involve any contradiction or variation of the literal terms* of the contract, though the two interpretations contended for do contradict each other. The construction contended for by the defendants would be subversive of the general purpose of the parties in entering into the contract, as indicated by the antecedent and contemporaneous correspondence, in that it would reduce the contract of guaranty to an absolute nullity. It would render the guaranty wholly ineffective, and without any application to the transactions actually had between the two banks. The Emmetsburg bank never did owe the Hawarden bank any sum on any note or notes 'executed by it'; nor was it contemplated that the Emmetsburg bank should become liable upon its indorsement of notes transferred by it; nor did it ever make any such indorsement, except without recourse. To have indorsed the notes would have rendered the whole plan ineffective. Its very purpose was to relieve the

Emmetsburg bank of that liability, and thereby to bring it within the requirements of the law. Such was the very contingency which called for the personal guaranty of the directors, to take the place of the liability of the bank as an indorser.

"It is argued for the defendants that the construction contended for by them accords with the literal terms of the writing, and that such terms may not be varied by parol evidence or by extraneous evidence of surrounding circumstances. Sufficient to say that such construction is no more literal than that contended for by the plaintiff. The plaintiff does not contend for any change in the terms of the contract, nor for any other meaning than that which is naturally imported by the terms used."

"There is authority for the view that parol evidence can be admitted only when the contract or writing on its face shows that it does not express the entire agreement of the party, and that such evidence is inadmissible in the case of a contract which by its terms purports to express the whole agreement, and that consequently parol evidence is inadmissible to show that a writing of such character does not express the entire agreement unless it appears that fraud or mistake has intervened. On the other hand it has been asserted that an omission of a portion of the agreement may be shown by parol. This discrepancy is, however, more apparent than real, and probably results more from a loose use of terms than a confusion of ideas, as both lines of cases may be reconciled with what appears to be the most satisfactory general rule that can be announced in respect to this matter; which is that while the writing itself is the only criterion by which the intention of the parties is to be ascertained, yet it is not necessary that the incompleteness thereof should appear on its face from a mere inspection of it, for it is to be construed in the light of its subject-matter and the circumstances under which and the

purposes for which it was executed. Indeed some of the cases, which state flatly that the instrument must appear on inspection to be incomplete, contain expressions showing a recognition of the modification that the surrounding circumstances may also be considered." 22 C. J. p. 1289.

*Martin* v. *Hemphill* (Tex. Comm. of App.), 237 S. W. 550 (20 A. L. R. 984), the court said:

"But there is another rule of the law of evidence which is equally elementary. It has been stated for the Supreme Court of Texas by Justice Williams in the case of *Coverdill* v. *Seymour,* 94 Tex. 1 (57 S. W. 37), as follows:

" 'It is sometimes the case that the writing represents only a part of the contract, the other parts being expressed orally, and in such cases, these parts not reduced to writing, which are consistent with the writing, may be shown.' "

The entire course of dealing between the parties to this case raises a question of fact as to whether there was an agreement entered into between the parties in the conference of February 21, 1937, in New York City, to the effect as contended for by defendants. The vice-president of the insurance company testified that he authorized the reduction of his thoughts and those of Mr. Farmer and Mr. Gotfredson into the written contract of insurance on the basis of $54,000 for the automobile insurance. It does not appear that such "thoughts" were reduced to writing in the contract. The policy on which plaintiff relies seems to be a policy containing the ordinary terms. Plaintiff's witness, Mr. Farmer, also testified that there was an agreement apart from the policies but not in writing, that defendants were to pay sufficient on renewal. Farmer also wrote Gotfredson requesting payment of $5,000 "in accordance with the agreement" although the policy made no mention of such agreement. Within two days

after the conference in New York, Gotfredson upon his arrival in Detroit, wrote a rather complete letter outlining the terms of the alleged agreement. Farmer received the letter but did not deliver it for a month or six weeks but plaintiff company, in any event, had this letter in its possession for nearly seven weeks before it cancelled the policy, and at no time did it question its terms in any correspondence or communication to Gotfredson. Farmer further advised Gotfredson that a memorandum would be drawn up and he even requested Gotfredson to outline again the terms of the understanding after this had already been done by Gotfredson in his letter of February 23, 1935.

Whether the agreement of the parties was reduced to writing in the policy or whether the policy was incomplete as the contract between the parties was a question of fact for the jury. Under the circumstances of this case, the insurance policy signed by plaintiff alone, whether delivered on oral application of defendants, or whether delivered to defendants with no written acceptance by them, cannot be said to be within the rule that prohibits parol evidence as to its completeness. Parol evidence was therefore admissible to prove the contract as alleged by defendants and it was error to enter judgment for plaintiff notwithstanding verdict on the ground that such evidence was inadmissible.

On the trial the plaintiff's proofs showed an indebtedness of $22,152.70, while the defendants admitted owing the sum of $11,175.78. The jury brought in a verdict in the amount of $14,534.13.

In the cross-appellant's assignments of error, it is requested that, in the event of reversal of judgment notwithstanding verdict, a new trial be granted for the reason that the verdict of the jury was the result

of compromise. Compromise verdicts are improper provided they are clearly compromises and could not have been reached by any proper method of computation, but a verdict will not be set aside as a result of compromise unless it clearly appears that it actually was such a result. *Richardson* v. *Railway Co.*, 182 Mich. 206.

Defendants submitted a statement in evidence, as embodying the items conceded to be owed plaintiff. This statement showed an indebtedness of $12,848.43. In addition, there was a statement of certain credits claimed. Among the items in the debit statement, were included premiums due and money owed under the agreement claimed to have been made between the parties. In this debit statement of $12,848.43, however, defendants claimed as a credit the sum of $2,500 which they had deducted in arriving at the total debit. This item of credit was disputed by plaintiff. If the jury refused to allow defendants such credit, the total indebtedness of items in the debit statement would amount to $15,348.43. Defendants also claimed a credit of $2,650 for having paid this amount on account of the alleged agreement of plaintiff to remain on the policies during the year of 1935. Plaintiff failed to carry out this agreement. In a colloquy with the court, the jury stated that it had allowed this credit to defendants. Such sum deducted from the above amount of $15,348.43 would leave an indebtedness of defendants to plaintiff in the amount of $12,698.43. Plaintiff filed a request to charge asking that if defendants were given such credit of $2,650 plaintiff, nevertheless would be entitled to credit for a *pro rata* amount for the 77 days that the insurance was in effect, namely, the sum of $564.66. Such a credit added to the above-mentioned sum of $12,698.43 made a total of $13,263.09. It was stated to the court

by the jury that it allowed plaintiff this amount as principal and $1,271.04 as interest, making an aggregate of $14,534.13, which was the amount of the verdict.

There is no showing in this case that the jury did not arrive at its verdict by the honest judgment of its members. It does not appear by any evidence or showing of plaintiff that any method of chance or compromise was allowed to be substituted for the judgment of the jury. The controverted matters with regard to the amount due on different policies and the computations regarding defendants' claims for credit because of payments made were complicated. The jury indicated its difficulties to the trial court before arriving at a verdict. The fact that the computations of the jury are not reconcilable to the claims of the parties in no wise vitiated its finding. There was evidence to support the verdict. The claim made that the result was a compromise verdict is not sufficiently sustained by the plaintiff.

The judgment *non obstante veredicto* is set aside and the case remanded to the circuit court for entry of judgment in accordance with the verdict of the jury. Costs to defendants.

WIEST, C. J., and BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred. BUTZEL, J., took no part in this decision.